UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON
- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | : CASE NO. 3-25-cr-3-TMRs |
| | : |
| Plaintiff, | : |
| vs. | : MOTION TO SUPPRESS |
| | : |
| TIMOTHY FARR, | : JUNE 17, 2025 |
| | : 1:30 P.M. |
| Defendant. | : |

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS M. ROSE,
UNITED STATES DISTRICT JUDGE, PRESIDING
- - -

APPEARANCES:

For the Plaintiff: RYAN A. SAUNDERS, ESQ.
U.S. Attorney's Office
200 W. Second Street
Suite 600
Dayton, OH 45402

For the Defendant: CHRISTOPHER M. FOGT, ESQ
Attorney at Law
5335 Far Hills Avenue
Suite 302
Dayton, OH 45429

Also Present: Timothy Farr, Defendant
Kristine Pfarrer, Paralegal
Detective Douglas Hall

Law Clerk: Joseph Brossard, Esq.

Courtroom Deputy: Elizabeth Penski

Stenographer: Mary Schweinhagen, RPR, RMR, RDR, CRR
United States District Court
200 West Second Street, Room 910
Dayton, Ohio 45402

Proceedings reported by mechanical stenography, transcript produced by computer.

*** *** *** ***

**INDEX OF WITNESSES**


| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **PLAINTIFF'S WITNESSES** | | | | |
| SEAN GALLAGHER | 4 | 23 | 31 | |
| DOUGLAS HALL | 33 | 44 | | |


* * * * *

**INDEX OF EXHIBITS**


| **PLAINTIFF'S** | **ADMITTED** |
|---|---|
| 1 | 52 |
| 2 | 52 |
| 2a | 52 |
| 3 | 52 |
| 3a | 52 |
| 3b | 52 |
| 3c | 52 |
| 4 | 52 |
| 5 | 52 |
| 6a | 52 |
| 7 | 52 |


* * * * *

P-R-O-C-E-E-D-I-N-G-S 1:37 P.M.

THE COURT: We're before the Court this afternoon in the matter of the United States of America versus Timothy Farr. This is Case Number 3-25-cr-3. We are here pursuant to a motion to suppress and request for a hearing filed by Mr. Fogt on behalf of Mr. Farr.

Would counsel enter their appearance?

MR. SAUNDERS: Good afternoon, Your Honor. Ryan Saunders on behalf of the United States.

MR. FOGT: Chris Fogt on behalf of Mr. Farr.

THE COURT: Counsel ready to proceed?

MR. SAUNDERS: Yes, Your Honor. Sitting to my left is Detective Doug Hall with the Dayton Police Department, Kristine Pfarrer from the U.S. Attorney's Office.

THE COURT: Thank you.

MR. FOGT: Yes, sir.

THE COURT: Let me ask this right up front. The Court sees that there are a number of at least proposed exhibits at this point in time, and I believe it appears that they would be presented by the government, and Mr. Fogt has had a copy of this?

MR. SAUNDERS: He has, Your Honor.

THE COURT: Mr. Fogt, I am not asking you to -- this is not ironclad, but do you appear to have any objections to those?

MR. FOGT: None, Your Honor, as to the authenticity thereof. Thank you, Your Honor.

THE COURT: All right. First witness.

MR. SAUNDERS: Thank you, Your Honor. The United States would call Officer Sean Gallagher to the witness stand.

**SEAN GALLAGHER, PLAINTIFF WITNESS, SWORN**

THE COURT: Officer Gallagher, you'll see you've got a microphone there in front of you. If it gets too close to you, it gets muffled; if it gets too far away, it's not going to pick you up. So you can adjust it around, but the best way to prevent any of that from happening is just keep your voice up so we can all hear you.

THE WITNESS: Yes, Your Honor.

THE COURT: You may proceed.

MR. SAUNDERS: Thank you, sir.

**DIRECT EXAMINATION**

BY MR. SAUNDERS:

**Q.** State your name for the record, please.

**A.** Yes. My name is Sean Gallagher.

**Q.** Can you spell your last name, please?

**A.** Yes, it's G-A-L-L-A-G-H-E-R.

**Q.** And, Mr. Gallagher, where are you employed?

**A.** The City of Dayton.

**Q.** Sir, how long have you been employed at the City of Dayton?

**A.** Eight years.
**Q.** And what do you do for the City of Dayton?
**A.** I'm a police officer.
**Q.** Can you explain to the Court your training and experience to become a police officer?
**A.** I completed the Dayton Police Academy.
**Q.** And, sir, back on December 16, 2024, were you working for the Dayton Police Department?
**A.** I was.
**Q.** And going back to your training in the police academy, during that academy, did you learn about the Ohio laws related to traffic offenses?
**A.** Yes, I did.
**Q.** Can you briefly explain to the Court the nature of that training?
**A.** We just complete ORC training and take tests and exams on it afterwards.
**Q.** And when you say "ORC," you mean the Ohio Revised Code?
**A.** Yes, sir, that's correct.
**Q.** And, sir, back on December 16, 2024, you mentioned you were working for the Dayton Police Department, correct?
**A.** That's correct.
**Q.** And, sir, what shift did you work on that evening?
**A.** We call it the 40s, but it's 5 p.m. to 3 a.m.
**Q.** All right. And prior to starting patrol that evening,

did you receive a Dayton Police Department "be on the lookout" or BOLO?

**A.** Yes, I did.

**Q.** Can you explain what a BOLO is for the Court, please?

**A.** It's a picture of an individual that is suspected of committing a crime or is wanted for a crime, and just try to identify them and locate them if possible.

**Q.** And, sir, I'm going to ask the deputy clerk to hand you what's been previously marked as Government's Exhibit 1.

And, sir, do you recognize Government's Exhibit 1?

**A.** Yes, I do.

**Q.** And how do you recognize Government's Exhibit 1?

**A.** I received this in an email.

MR. SAUNDERS: And permission to publish, Your Honor?

THE COURT: You may.

Mr. Fogt, if at any point in time you change your mind that you are objecting to the exhibit or their publication, please speak up.

MR. FOGT: Thank you, sir.

MR. SAUNDERS: And, Your Honor, for purposes of the record, there are certain items that are not going to be published, this being one of them. The media files will be published for the Court.

THE COURT: That's fine. It's your case. However

you wish to go forward.

MR. SAUNDERS: Thank you, sir.

BY MR. SAUNDERS:

**Q.** So referencing Government's Exhibit 1, can you explain to the Court what this BOLO is, please?

**A.** This is the suspect of a person that committed aggravated robbery.

**Q.** And do you see up in the top right corner of that document the date that this was provided to you?

**A.** I do, yes.

**Q.** And what was the date?

**A.** This was Monday, December 16, 2024.

**Q.** And what time?

**A.** 2:56 p.m.

**Q.** And, sir, can you please read the Priority Information in that Government's Exhibit 1?

**A.** "The below suspect has been identified as robbing four businesses in the last eight days. Please do not" -- sorry. "Please be extra observant around convenience stores, drive-thrus, carry-outs. He is armed with a semiautomatic handgun. He has worn the same clothing in each robbery. Two robberies have been in East Patrol; two robberies, West Patrol. He is mobile. Note the" -- I'm sorry. "Note the identifiable Croc-style sandals with holes on top, gray WM gloves, and N-95 medical mask and a large yellow band.

Contact Detective Hall if there is any additional information regards to this pattern."

**Q.** And, sir, can you read the bottom portion just below the Priority Information?

**A.** Yes. "Suspect often wears the black jacket with a gray undershirt that hangs slightly below the bottom of the jacket. Off brand Croc-style shoes, commercial."

**Q.** Sir, on December 16, 2024, you mentioned you were working. You provided the Court the shift 5 to, I think you said, 3 a.m.?

**A.** That's correct.

**Q.** And when you received this BOLO prior to going on shift, did you have any plans of action to try to locate and apprehend this suspect?

**A.** I'm sorry. Could you say that again for me?

**Q.** Yeah. When you received this BOLO, you received the BOLO approximately 2 -- I believe it was 2:56 p.m. that day. So you go on shift at 5 p.m.?

**A.** Correct.

**Q.** Did you or any or members of the Dayton Police Department determine a plan of action to try to apprehend the suspect of these robberies?

**A.** Yeah. Yes, we did.

**Q.** And, sir, can you provide that to the Court?

**A.** Yeah, so Officer Michael Conrads had contacted my

sergeant, which is Sergeant Banks, and informed me that he located a potential vehicle on Flock.

**Q.** Can you explain to the Court what Flock is?

**A.** Flock is a camera system that is stationed at different intersections throughout the city that, whenever a car drives through it, it will take a picture of the vehicle and the license plate, it will tell you the location, the time, and the direction of travel.

**Q.** And, sir, when you started your shift on December 16, 2024, were you provided a make, model, and year of a suspected vehicle for these robberies?

**A.** I was, yes.

**Q.** And, sir, what was that make, model, and year of the vehicle?

**A.** I do not recall the year off the top of my head right now, but I believe the make and model was a red Ford Taurus.

**Q.** And did you have a license plate number based on the Flock information?

**A.** I did, yes.

**Q.** And did you put that information into your police vehicle?

**A.** Yes, I entered that into my personalized Flock hot list.

**Q.** Explain to the Court what a personalized Flock hot list is, please.

**A.** A personalized Flock hot list is a list that I actually enter into my computer, and then whenever that vehicle drives past the Flock camera system, it will send an alert and notification onto my screen.
**Q.** All right. And you did that in this particular case, correct?
**A.** That is correct.
**Q.** And, sir, I want to direct your attention to approximately 2005, or 8:05 hours in the evening, 8:05 p.m. Did you happen to run across the suspected vehicle?
**A.** Yes, I did.
**Q.** And explain to the Court how this came about, please.
**A.** I received a Flock notification, I believe it was at the intersection of Brooklyn Avenue and Hoover Avenue, that the vehicle was driving southbound, which would be towards West Third Street, which is where my location was.
**Q.** All right. And did you physically observe this vehicle then?
**A.** I did, yes.
**Q.** And what did you do next?
**A.** So I was driving eastbound on West Third Street, and I observed the vehicle make a westbound turn from Brooklyn onto Third Street. So I drove past the vehicle initially, and then I completed a U-turn behind the vehicle.
**Q.** And, sir, Dayton Police Department, they have body-worn

issued cameras, correct?
**A.** That's correct.
**Q.** They also have dash cameras on the vehicles, correct?
**A.** That is correct.
**Q.** And this particular day, on December 16, 2024, was your dash camera working?
**A.** Yes, it was.
**Q.** And was your body-worn camera working?
**A.** Yes, it was.
**Q.** And pursuant to this investigation, have you provided the United States Attorney's Office with the body-worn camera and the dash camera from December 16, 2024?
**A.** Yes.
**Q.** Sir, I'm next going to have you observe Government's Exhibit 2, which has been previously marked and authenticated by you on the disk.

MR. SAUNDERS: I'm going to ask Ms. Pfarrer to play Government's Exhibit 2a, please.

(Video playing.)

MR. SAUNDERS: Please turn the audio on, Ms. Penski.

THE COURTROOM DEPUTY: It should be on.

THE COURT: Do you want to stop a second?

(Video stopped.)

MR. SAUNDERS: For purposes of the actual -- this stop, we don't need the sound, but for the body-worn camera,

we will.

THE COURT: Okay.

BY MR. SAUNDERS:

**Q.** So as they are working on that, sir, I am going to ask you some questions about this initial dash camera. So explain to the Court what it just reviewed on Government's Exhibit 2a.

**A.** This was the vehicle that was entered in my Flock list. Like I said, I completed a U-turn behind it, and then I initiated a traffic stop on it.

**Q.** All right. And, sir, what was the basis for conducting the traffic stop on this vehicle?

**A.** The basis was for a window tint, which appeared to be darker than the legal limit in the state of Ohio, as well as loud exhaust.

**Q.** And at some point in time did you eventually get out of the vehicle and approach the passenger side of the vehicle?

**A.** I did, yes.

**Q.** All right. I'll take a brief pause while they try to get the audio working.

MS. GEZINSKI: Liz, can you please turn the audio off and turn it back on, please.

What I want to do is go back down and get another laptop, and I can play the sound on that one and the video on this.

MR. SAUNDERS: Is that okay, Your Honor?

THE COURT: Yes. Do you want to recess for --

MR. SAUNDERS: A brief recess, please.

THE COURT: We will stand in recess for a few minutes.

THE COURTROOM DEPUTY: All rise. This court is in recess.

(Recess from 1:50 p.m. until 1:54 p.m.)

THE COURT: Ready to proceed?

MR. SAUNDERS: Yes, sir.

THE COURT: Go ahead.

MR. SAUNDERS: Ms. Pfarrer, go ahead and play Government's Exhibit 2a again, please.

(Video playing.)

(Video stopped.)

BY MR. SAUNDERS:

**Q.** All right, sir. You have had an opportunity to review Government's Exhibit 2a?

**A.** Correct.

**Q.** You mentioned that the initial reason for the traffic stop was loud exhaust and window tint violation?

**A.** That's correct.

**Q.** And then the Court just reviewed you walking up to the passenger side of that vehicle.

MR. SAUNDERS: Now if we could play Government's Exhibit 3a, please.

(Video playing.)

(Video stopped.)

BY MR. SAUNDERS:

**Q.** All right. Sir, you had an opportunity to review Government's Exhibit 3a?

**A.** Yes.

**Q.** I will ask you a few questions about that body-worn camera video.

**A.** Okay.

**Q.** All right. So you approached the vehicle. You asked the individuals what?

**A.** Asked them for their IDs.

**Q.** Okay. And you provide the driver the basis for the traffic stop?

**A.** Yes, I did.

**Q.** And what did you tell him?

**A.** It was for a window tint and a loud exhaust.

**Q.** All right. And did the passenger of the vehicle, did he speak to you when you first encountered them?

Did Mr. Farr, the passenger of the vehicle, did he say anything to you when you first approached the vehicle?

**A.** I do not believe so.

**Q.** And did he provide you any identification?

**A.** No, he did not.

**Q.** At that point in time, what did you do?

**A.** I asked him to unlock the car door, to open the door.

**Q.** All right. And did you ask Mr. Farr to get out of the vehicle or order him to get out of the vehicle?

**A.** Yes, I did.

**Q.** All right. And what did you do next?

**A.** Right before, I asked if they had any weapons or drugs inside the vehicle.

**Q.** Okay. And what was the response of the driver?

**A.** The driver said no.

**Q.** And what was the response of Mr. Farr?

**A.** He didn't say anything.

**Q.** All right. And when you got Mr. Farr out of the vehicle, did you question him?

**A.** I instructed him to put his hands up, which he complied with.

**Q.** All right. And what happened next?

**A.** I asked him again if he had anything on him.

**Q.** And did he reply?

**A.** Yeah, he informed me that he had a firearm in his waistband.

**Q.** All right. And what did you do next?

**A.** I removed the firearm, and I placed it in the grass behind me, and then I placed him in handcuffs.

**Q.** All right. And, sir, why did you place Mr. Farr in handcuffs at that point in time?

**A.** He didn't inform me initially when I asked if there was a firearm inside of the vehicle.
**Q.** All right. And, sir, you are familiar with criminal laws in the state of Ohio, correct?
**A.** Yes.
**Q.** Sir, is that a violation of the CCW law of the state of Ohio?
**A.** Yes, it is.
**Q.** And, sir, since the time of Mr. Farr's arrest, have you done a records check on Mr. Farr?
**A.** Yes, we have.
**Q.** And, sir, did you learn that Mr. Farr is currently prohibited under state law from possessing a firearm?
**A.** Yes, I did.
**Q.** And so, sir, at this point in time when you located the firearm on his waistband, was he in violation of the state law of having weapons while under disability?
**A.** Yes, he was.
**Q.** All right. And, sir, what did you do next after placing Mr. Farr in custody with handcuffs? Did you ask him anything else?
**A.** Not until he was placed in the cruiser.
**Q.** All right. Did you ask him if you could search him?
**A.** Oh, I'm sorry. Yes, I did.
**Q.** And what did he say to that?

**A.** He gave consent to the search.
**Q.** And did you search him?
**A.** Yes, I did.
**Q.** And what did you discover during the search of him?
**A.** I located the gray rubber gloves in his front left jacket pocket.
**Q.** And circling back to Government's Exhibit 1, the BOLO?
**A.** Yes.
**Q.** Were those gray WN gloves like and similar to the BOLO notable gloves that you received at 2:56 on that date of the traffic stop?
**A.** Yes, they were.
**Q.** And, sir, just generically, when you conduct an arrest of a person, is it the policy of the Dayton Police Department to search them incident to arrest?
**A.** Yes, it is.
**Q.** And so even if you had not asked Mr. Farr for consent to search, would you, pursuant to your policy, searched him incident to arrest?
**A.** Yes, I would have.
**Q.** And would you have discovered the gray WN gloves in his right pocket?
**A.** It was his front left pocket.
**Q.** Excuse me. Left pocket. Thank you.
**A.** Yes.

**Q.** All right. So you go ahead and try to determine who the passenger of the vehicle was. At some point in time did he provide you that information?
**A.** Yes, he did.
**Q.** And at the time that he provided you the information, you had placed him in the back of the police cruiser, correct?
**A.** That is correct.
**Q.** And did he provide you his name, his date of birth, his social security number?
**A.** Yes, he did.
**Q.** And for purposes of the record, that has been redacted pursuant to local rules with PII. Do you understand that?
**A.** Yes, sir.
**Q.** All right. Now, he also provided you with his phone number, correct?
**A.** That's correct.
**Q.** And, sir, when you ask someone for their name, date of birth, social security number, phone number, are those common what we refer to as pre-booking questions or pre-book-in questions?
**A.** Yes, it is.
**Q.** And did Mr. Farr provide you with his phone number?
**A.** Yes, he did.
**Q.** And do you recall the last four of that phone number?
**A.** Not off the top of my head.

MR. SAUNDERS: Can we go ahead and play back the portion where he provides his PII, to Officer Gallagher, please. I think it was towards the middle where the redaction is.

(Video playing.)

MR. SAUNDERS: I got 5:47.

(Video stopped.)

BY MR. SAUNDERS:

**Q.** So you heard the phone number there?

**A.** Yes, I did.

**Q.** Last being 8838, correct?

**A.** That's correct.

**Q.** And, sir, you also ran a records check on the firearm that was on Mr. Farr's waistband, correct?

**A.** Correct.

**Q.** Did that firearm come back as stolen?

**A.** Yes, it did.

**Q.** Is it a violation of the state law to possess a stolen firearm?

**A.** Yes, it is.

**Q.** And what is that violation?

**A.** Receiving stolen property.

**Q.** All right. And, sir, after you get the information from Mr. Farr, you continue your investigation. You mentioned when you went back to speak to another officer who was at the scene

that there was something on the floorboard. Can you explain that to the Court, please?

**A.** Yeah. It was like and similar to the N95 mask in the picture. It was the white N95 mask with the yellow straps on it.

**Q.** All right. And in addition, what type of shoes was Mr. Farr wearing?

**A.** The off-brand Crocs.

**Q.** Similar to the BOLO that you received?

**A.** Correct.

**Q.** And at that point in time, after you got the information from Mr. Farr, he's placed into custody, did you also confirm that the vehicle window tint was, in fact, less than 50 percent --

**A.** Yes, I did.

**Q.** -- transmission or translucent?

**A.** Yes.

MR. SAUNDERS: All right. Go ahead and roll Government's Exhibit 3c, please -- or excuse me -- 3b, as in "boy."

(Video playing.)

(Video stopped.)

BY MR. SAUNDERS:

**Q.** So, sir, the video, Exhibit 3b, what were you doing in that vehicle?

**A.** I was checking the window tint.

**Q.** And what was the window tint on that vehicle?

**A.** 39 percent.

**Q.** And do you recall what the legal limit on a passenger window of a vehicle in the state of Ohio is?

**A.** Yes, it's 50 percent.

**Q.** So as such, the item you had that was detecting the window tint, it was less than what is legally allowed to be operated on Ohio roadways, correct?

**A.** That is correct.

MR. SAUNDERS: If we can go ahead and play Government's Exhibit 3c, as in "Charlie."

(Video playing.)

(Video stopped.)

BY MR. SAUNDERS:

**Q.** All right. Officer Gallagher, you just observed Government's Exhibit 3c, a portion of your body-worn camera footage. What are you telling the officers at the scene during that body-worn camera footage?

**A.** I was telling them about the items that I located on Mr. Farr.

**Q.** All right. In summation, the gloves in the, I think you said, right pocket?

**A.** Yeah. It was incorrect when I told them that. It was actually the front left jacket pocket.

**Q.** Left jacket pocket. A firearm on the waistband, and the N-95 on the dash -- or the floorboard of the passenger side, correct?
**A.** That is correct.
**Q.** There was also discussion about getting a search warrant for that vehicle, correct?
**A.** Yes, that's correct.
**Q.** And you're aware that eventually ATF adopted the case and did obtain a search warrant for that vehicle, correct?
**A.** Correct.
**Q.** Did you end up citing Roger Gullatte, the driver of the vehicle?
**A.** Yes, I did.
**Q.** And what did you cite him for?
**A.** For window tint and loud exhaust.
**Q.** And has he since pleaded guilty in municipal court for those offenses?
**A.** Yes, he did.

MR. SAUNDERS: Your Honor, if I may have one moment, please.

THE COURT: Sure.

(Pause.)

MR. SAUNDERS: No further questions. Thank you.

THE COURT: Mr. Fogt.

MR. FOGT: Thank you.

**CROSS-EXAMINATION**

BY MR. FOGT:

**Q.** Good afternoon, Officer.

**A.** Good afternoon, sir.

**Q.** So looking at Government's Exhibit 1, the BOLO, in the Priority Information -- this is really small to read here -- is there any mention of the car itself in Government Exhibit 1, the Taurus?

**A.** No, there is not.

**Q.** You learned about the Taurus through, you say it was an email?

**A.** No. My sergeant actually contacted me over the phone and informed me of it.

**Q.** Okay. What's your sergeant's name?

**A.** Sergeant Zachary Banks.

**Q.** And he contacted you on the 16th of December of 2024?

**A.** That is correct.

**Q.** Did he give a year or just the make and model and color?

**A.** He gave me the year, the make, the model, the color, and the license plate.

**Q.** The license plate was pulled from Flock?

**A.** That is correct.

**Q.** So you were on duty that night, and you believe you saw what the sergeant told you to look out for, the Ford Taurus, correct?

**A.** That's correct.
**Q.** You made a U-ie and turned around, correct?
**A.** Correct.
**Q.** And according to Government's Exhibit, I believe it's 2a, you followed the car for a minute or two; is that accurate?
**A.** Yeah, that's accurate.
**Q.** Then I thought I heard a dog in the background. Was that a K-9?
**A.** Yes, sir.
**Q.** What's his or her name? Was it Lori or Rory?
**A.** It's Corey, with a C.
**Q.** Corey. Corey was barking, correct?
**A.** That's correct.
**Q.** Was Corey barking before the lights went on in your cruiser or after?
**A.** No, he barks after it. It amps him up whenever the lights and sirens come on.
**Q.** So he's barking. Your window's up?
**A.** Yes.
**Q.** Okay. And you are telling the Court that you could hear the loud exhaust with the windows up and the dog barking?
**A.** The dog wasn't barking until I look -- until I turned my lights on. But, yes, I could.
**Q.** And you were pretty close to the vehicle when your lights turned on?

**A.** Yes, I was.
**Q.** I don't want to play the foot game for too long, but about how many feet were you -- were you within the vehicle?
**A.** When the lights came on or are you saying --
**Q.** When the lights came on. Let's not do feet. Let's do car lengths.
**A.** I would have to watch the video again and tell you guys on that. I'm not sure off the top of my head.
**Q.** Would you agree with me whatever the video depicts is the distance you were from?
**A.** Yeah, absolutely.
**Q.** There you go. And it was dark when the vehicle was pulled over, right?
**A.** Correct.
**Q.** Do you recall about what time the vehicle's pulled over?
**A.** I believe it was roughly around 8 p.m.
**Q.** Okay. Was it raining out? There was some water -- it looked like water on your hood. Had it rained or was it raining?
**A.** I don't recall off the top of my head.
**Q.** Again, whatever the video depicts is an accurate depiction of the weather?
**A.** Correct.
**Q.** Very good. So you said you believed at that time -- you turned out to be right according to the measurement -- that

the window tint was not legal tint. It was not legal, correct?
**A.** That's correct.
**Q.** Okay. Do you have any training in the academy or even after the academy of eyeballing window tint?
**A.** It's just a skill that I guess I had developed over the years of working.
**Q.** How long have you been working again?
**A.** Eight years.
**Q.** Eight years. Have you always been a road cop for the eight years?
**A.** Yes, I have.
**Q.** So let's stick with the window tint for a second. You eventually tested, and it's 39, right?
**A.** That's correct.
**Q.** And the instrument that you use, do you know if that instrument was calibrated recently and/or checked against a controlled variable?
**A.** Yeah. Actually, right before the video, if you would have rewound it about 15 seconds, you would actually see I checked it for calibration right on camera.
**Q.** How do you calibrate it?
**A.** I do not calibrate it. I check for the calibration. So I enter the --
**Q.** Can you walk me through it? Thank you.

**A.** I enter the -- they have two different pieces of glass, and I enter that into it and it gives me the measurement. And then I pull one out, and I place the next one in.
**Q.** And then when you approached the vehicle initially, you approached it from the passenger side, right?
**A.** That is correct.
**Q.** The driver, when you asked for his identification, he acknowledged that there was a question asked, right?
**A.** He acknowledged that I was asking for his --
**Q.** You posed a question, did you not?
**A.** For his identification?
**Q.** Yes.
**A.** Yes.
**Q.** Did he respond?
**A.** Yes.
**Q.** So he heard you?
**A.** Yes.
**Q.** Okay. Going back for a minute about when you were pulling him over, you were still in your cruiser, there's that low tone that was emitting. Was that emitting from your vest, your person, or does that emit from your car? That beeping, low tone.
**A.** I'm not sure which tone you are talking about.
**Q.** You don't recall there's just a low tone that beeps every few seconds once the lights go on?

**A.** Okay, so that's from the side of the vehicle then.
**Q.** Okay.
**A.** Yes.
**Q.** Okay. And that was going on when you were pulling the car over?
**A.** That goes on whenever I activate the overhead headlights.
**Q.** Thank you. What was the purpose of asking Mr. Farr to exit the vehicle?
**A.** Well, I believe that he fit the description from this BOLO and that he was possibly armed with a handgun.
**Q.** And when he exited shortly thereafter, you put him in handcuffs once verified that he had a firearm in his waistband?
**A.** That's correct. After I removed it, I placed him in handcuffs.
**Q.** So at that point you would agree with me that he was detained, correct?
**A.** No. I would say that he was under arrest because I asked both of them in the car if there were any firearms in the car, and he denied -- and he declined to answer.
**Q.** On the video, did you notify him that he was under arrest?
**A.** No, I did not.
**Q.** You mentioned that Mr. Farr had a back brace on; is that

accurate?
**A.** That's correct.
**Q.** You were asked on direct that you would have found the gloves in the left front pocket because the search incident to arrest; is that accurate?
**A.** That's correct.
**Q.** At least in part, Officer, Mr. Farr was arrested that day because there were several items located either on his person or in the car that was seen in the BOLO; is that accurate?
**A.** I'm sorry. Could you say that again, please?
**Q.** I said at least in part one of the reasons that Mr. Farr was arrested that evening was 'cause some of the items that were in the BOLO were similar to the ones that were found in the vehicle; is that correct?
**A.** That's correct.
**Q.** Before getting Mr. Farr out, you asked for his identification, correct?
**A.** That's correct.
**Q.** He didn't have any on him?
**A.** No, not that he informed me of.
**Q.** And then, then you got him out after that. Did you ask him prior to him getting out for his social security number or his date of birth?
**A.** I do not believe so, no.
**Q.** But later on when he was handcuffed, under arrest, your

words, in the back of the cruiser, you asked for his social security and date of birth; is that correct?
**A.** That's correct.
**Q.** And did he provide them?
**A.** Yes, he did.
**Q.** And then you were able to identify him as Timothy Farr?
**A.** That's correct.
**Q.** Was the car searched on scene?
**A.** No, it was not.
**Q.** How was it removed -- was it removed from the scene?
**A.** Yes, it was.
**Q.** In what manner?
**A.** It was towed.
**Q.** By a third party or by the law enforcement, yourselves?
**A.** It would have been by Sandy's Towing.
**Q.** Where was it taken?
**A.** To our evidence crew garage.
**Q.** Where is the evidence crew garage?
**A.** Over next to --
**Q.** Give me an address if you know it, or at least a street.
**A.** I believe -- I think they like to keep that as --
**Q.** Okay. Is it in the City of Dayton?
**A.** It is, yes.
**Q.** Do you yourself know where it is?
**A.** I do, yes.

**Q.** Do you have any other involvement in this matter?
**A.** No, I do not.
**Q.** Was Roger Gullatte, the driver, was he placed under arrest or was he free to go?
**A.** I believe he was arrested that evening as well.
**Q.** Was it related to this matter or unrelated?
**A.** If I recall correctly, I believe it was related to it.
**Q.** Thank you, Officer Gallagher. Nothing further.
**A.** Thank you, sir.

THE COURT: Redirect. With regard to those matters covered on cross.

MR. SAUNDERS: Yes, sir.

**REDIRECT EXAMINATION**

MR. SAUNDERS: Ms. Pfarrer, I am going is to ask you to play Government's Exhibit 3a. It's the first portion of the body worn camera.

(Video playing.)

BY MR. SAUNDERS:
**Q.** Sir, is that noise the muffler?
**A.** Yes, it is.
**Q.** Right there?
**A.** Yes, it is.

MR. SAUNDERS: Stop.

(Video stopped.)

BY MR. SAUNDERS:

**Q.** And it's your testimony before this Court that you could hear that sound prior to turning on your overhead lights?

**A.** That is correct, yes.

**Q.** And before your K-9 started barking?

**A.** That's correct, yes.

MR. SAUNDERS: No further questions. Thank you.

THE COURT: Anything with regard to that?

MR. FOGT: No follow-up, Your Honor. Thank you.

THE COURT: Thank you.

Anything further for this witness?

MR. SAUNDERS: No, sir. Thank you.

THE COURT: This witness can be excused? All right.

Thank you, sir.

THE WITNESS: Thank you very much, Your Honor.

THE COURT: Next witness.

MR. SAUNDERS: The United States would call Detective Douglas Hall to the witness stand.

**DOUGLAS M. HALL, PLAINTIFF WITNESS, SWORN**

THE COURT: Detective, you heard my speech. You need to stay close to the microphone or just make sure it's picking you up and you are not muffled or it's not picking you up. If you keep your voice up, I'm sure that we can all hear you.

THE WITNESS: Yes, Your Honor.

THE COURT: You may.

**DIRECT EXAMINATION**

BY MR. SAUNDERS:

**Q.** Can you state your name for the record, please?

**A.** Sure. Douglas M. Hall. Last name is spelled H-A-L-L.

**Q.** And, Mr. Hall, where are you employed?

**A.** City of Dayton Police Department.

**Q.** And how long have you been employed at Dayton?

**A.** Over 28 years now.

**Q.** And, sir, what do you do for the City of Dayton Police Department?

**A.** Currently, I'm assigned as a detective with the Violent Offender Unit.

**Q.** And, sir, back in December of 2024, were you working in the Violent Offender Unit?

**A.** That is correct, sir.

**Q.** And, sir, can you explain to the Court your duties as a detective in that unit?

**A.** Sure. As the Violent Offender Unit, our general investigative tasks include any type of armed or unarmed robberies, any gun-related crimes, any serious assaults, kidnappings, or any other associated crimes that would be considered violent in nature.

**Q.** Sir, back in early December, in December of 2024, the Violent Offender Unit began investigating a string of armed robberies throughout the City of Dayton and surrounding areas,

correct?

**A.** Yes, sir.

**Q.** And, sir, can you explain to the Court the general nature of your investigation of these armed robberies?

**A.** Sure. So on Monday, December the 9th, when I got into work, I was assigned an armed robbery that occurred on Xenia Avenue in the City of Dayton at Ray's Mini Mart. I read through that initial report, including a description that the officers had put in there, and I observed that it could possibly have been related to an armed robbery that had occurred the week before, I believe it was December the 3rd, at the Sunoco at Wayne and Wyoming, which was also in the City of Dayton.

As a general course of business, we speak among ourselves in violent unit, detectives, like newer cases that are assigned to us to determine if any of our cases may be related. Detective Matthew Gray, G-R-A-Y, who is a member of Violent Offenders Unit, was also assigned a robbery that occurred over the weekend, I believe it was on December the 7th. And that was at the Free Pike Drive-Thru, also in the City of Dayton.

So speaking to Detective Gray and observing his report, it appeared that what was written in those reports, there was a general like and similar description of the circumstances and the clothing worn by the suspect.

At that point, we began to further our investigations by going to those two particular establishments and making arrangements to either download video, or in my case for Ray's market, I had the video sent to me digitally by the manager of the store. And when we were able to view those videos, it was clear that the suspect appeared to be the same person, wearing the same clothing in both of those incidents.

I spoke to Detective Curley, C-U-R-L-E-Y. He is also another detective. He was able to help us review some video from the Sunoco mart from earlier the week prior, and at that point, we felt fairly confident that we were dealing with perhaps the same person who was committing multiple robberies.

**Q.** All right. And, sir, what did you do next as part of this investigation?

**A.** I was able to aggregate, or put together, some still photos from these different robbery scenes. I sent them out to a couple different places or destinations via email, one being the Tactical Crime Suppression Unit, which is a law enforcement intelligence group made up of multiple jurisdictions throughout the generally southern part of Montgomery County. And I informed them of what I had discovered so far, and also to determine if they may have had some like and similar crimes in their jurisdiction.

Then also I put out an initial BOLO or Officer Safety Bulletin via email to the officers for the City of Dayton, including some pictures depicting the suspect in those initial robberies.

**Q.** I'm going to ask the deputy clerk to hand you what's been previously marked as Government Exhibit 4.

And, sir, what is Government's Exhibit 4?

**A.** This is a copy of the email that I initially sent out on the 11th with some general information and then some photos of the suspect in a robbery not only from Ray's but then also from the Free Pike Drive-Thru.

**Q.** And, sir, can you please read the contents of the BOLO into the record?

**A.** Well, I will give it a shot. I didn't know we were going to be reading or else I would have brought my reading glasses with me.

THE COURT: Now, what exhibit are you asking him to read from?

MR. SAUNDERS: Exhibit 4, but if he is having difficulty reading it, I --

THE COURT: Are you considering that -- it's been identified as an email.

MR. SAUNDERS: Yes.

BY MR. SAUNDERS:

**Q.** Is that the BOLO in the email fashion that you sent out

to officers, sir?
**A.** Yes.
**Q.** Okay. And that's different from the BOLO that the Court has reviewed previously from Officer Gallagher, correct?
**A.** Correct. As the investigation proceeded, there was additional information sent out.
**Q.** So this was the original BOLO, and then supplemented with the BOLO that Officer Gallagher has testified to, correct?
**A.** Correct.
**Q.** All right. Are you able to read that, or would you like me to read that into the record?
**A.** You know, I don't want to misspeak and read an incorrect word, and so it might be a little bit easier if you read it in.
MR. SAUNDERS: Mr. Fogt.
MR. FOGT: As long as you go through and lay the foundation, please. Thanks.
BY MR. SAUNDERS:
**Q.** "The below suspect has been identified as robbing four businesses in the last eight days. Please be extra observant around convenient stores, drive-thru, carry-outs. He is armed with semi-auto handgun. He has worn the same clothing in each robbery. Two robberies have been in East Patrol and two robberies have been in West Patrol, so he is mobile. Note the identifiable Croc-style sandals with holes in the top, gray WM

gloves, and N-95 medical mask with large yellow bands."

Sir, after reading that into the record, do you recall drafting that email that was sent out to DPD officers on Wednesday, December 11, 2024?

**A.** Yes.

**Q.** And, sir, is that a true and accurate email that you provided to the officers in an officer safety BOLO subject line?

**A.** It is.

**Q.** All right. And after you sent this email out, did anyone from your unit or surrounding jurisdictions, were they able to determine if there was any vehicles associated with a robbery or robberies throughout the area?

**A.** Yes.

**Q.** All right. Explain that to the Court.

**A.** So as myself and other members were conducting this investigation, the crimes continued to occur as we went through that week of December. And eventually, initially for me, when I came back to work December the 16th, in the early morning hours, I had received an email from Officer Michael Conrads, C-O-N-R-A-D-S. He's a patrol officer with the City of Dayton. And he had been dispatched on one if not several of these robberies. And he sent me an email stating that he was utilizing the Flock system in an attempt to possibly identify a getaway vehicle for this robbery

spree. And he had identified what he believed was at least a possible vehicle. And he sent me a short synopsis of the robbery locations and when that vehicle was documented being in the general area by a Flock system. And he also obviously gave me the vehicle description and the license plate.

**Q.** All right. And at some point in time, did you or other members of the violent crime unit determine where that vehicle was located?

**A.** Yes. So with that information on the 16th, and quite a few investigative breaks came fairly quickly that day. Additional information on that vehicle came from Springfield Police Department. Detective Massie contacted Detective Ellis, E-L-L-I-S, in our unit, explained that he was also working on some robberies in Springfield and Clark County that were like and similar, not only to the method of operation but the suspect's clothing description.

He also provided that same vehicle, and he had come about it, my understanding, through the intelligence hub with OSP and some of his own investigation using a Flock system in the City of Springfield. So myself, other members of our unit, and Special Agent Chris Reed with the ATF decided that we would go out, try to further identify this vehicle. We had one or two locations where we believe the vehicle may have been, and so we did go out and attempt to

locate it.
**Q.** All right. And were you successful in locating the vehicle?
**A.** We did. Detective Ellis observed it parked behind a address on Kammer Avenue in the City of Dayton.
**Q.** And do you recall the date that Detective Ellis observed the vehicle?
**A.** Yes, it was the 16th.
**Q.** Was it during the daytime?
**A.** It was during the daytime, around noon.
**Q.** Okay. And what did you all do next after you determined where the vehicle was located?
**A.** It didn't appear that it was moving at that point. It was kind of a rainy, cold day at that point. We went back and we had some tactical discussions as to what our next prudent step in the investigation may be and also put together a plan to perhaps request additional manpower from ATF in Cincinnati to help further the investigation.
**Q.** All right. At some point in time in the evening hour of -- evening hours of December 16th, did you get called into work?
**A.** Yes, sir.
**Q.** And, sir, why did you get called into work?
**A.** I was called in by my supervisor, and he explained that they had stopped the vehicle that we believed to be the

suspect vehicle on the armed robbery spree; that they had two people at least detained; and they had recovered some items of evidentiary value.

**Q.** And, sir, at some point in time, was one of the individuals who was later identified as Timothy Farr, was he brought down to the Public Safety Building?

**A.** Yes, both the driver and the passenger were brought to the Safety Building.

**Q.** For the record, the driver was Roger Gullatte and the passenger is Timothy Farr, right?

**A.** Yes, sir.

**Q.** And did you and Special Agent Christopher Reed from ATF attempt to interview Mr. Farr?

**A.** Yes.

**Q.** I'm going to ask the deputy clerk to hand you both Government's Exhibit 5 and 7, so she doesn't have to get up twice.

First, direct your attention, sir, to Government's Exhibit 5. Do you recognize Government's Exhibit 5?

**A.** Yes. This is a standard preinterview form for the Dayton Police Department, and on the bottom left it says Form F-300, which kind of designates its title for the City of Dayton Police Department.

**Q.** All right. And, sir, the City of Dayton Police Department's Public Safety Building, the interview rooms are

both audio and video recorded, correct?
**A.** Yes.
**Q.** And during this incident when you attempted to interview Mr. Farr, was it audio and video recorded?
**A.** Yes, sir, it was.
MR. SAUNDERS: I am going to ask Ms. Pfarrer to go ahead and play Government's Exhibit 6a for the Court, please.
(Video playing.)
(Video stopped.)
MR. SAUNDERS: Stopping Government's Exhibit 6a at 1:51.
BY MR. SAUNDERS:
**Q.** Sir, you heard the Government's Exhibit 6a audio and video recording. What was the phone number and its reference on Government's Exhibit 5, the preinterview form as well, what was the phone number that Mr. Farr gave you?
**A.** 937-856-8838.
**Q.** And for stipulation and purpose of the record, eventually Mr. Farr did invoke his right to counsel, and the interview ceased at that point in time, correct?
**A.** Yes, sir.
**Q.** All right. Next, sir, after the attempted interview of Mr. Farr, we're going to the preinterview form. The name, date of birth, social security number -- date of birth and social security number were redacted for PII in this video --

but those questions and the question of the address and the phone number, those are general pre-booking questions, correct, that you would routinely ask individuals?

**A.** Yes.

**Q.** All right. And after Mr. Farr invoked his right to counsel, he was eventually transported to the Montgomery County Jail, correct?

**A.** Yes.

**Q.** And at some point in time, did you assist Special Agent Reed in executing a search warrant on the 2011 red Ford Taurus that was stopped by Officer Gallagher on December 16, 2024?

**A.** Yes.

**Q.** And, sir, I'm going to have you reference Government's Exhibit 7. Do you recognize Government's Exhibit 7?

**A.** Yes. This is the warrant and affidavit that Special Agent Reed completed.

**Q.** And, sir, did you assist Special Agent Reed in executing that warrant?

**A.** Yes.

**Q.** And did you execute the warrant with Special Agent Reed reasonably relying on the search warrant that was issued by Magistrate Judge Caroline H. Gentry?

**A.** I did, sir.

**Q.** And, sir, throughout the investigation, you were the state detective involved in investigating at least the

multiple robberies in the Montgomery County area, correct? In the City of Dayton?

**A.** Yes.

**Q.** And because of the nature of the investigation, you're aware that it had crossed multiple jurisdictions throughout Southwest Ohio, correct?

**A.** That is correct, sir.

**Q.** And, sir, are you familiar with those other robberies throughout the Southwest Ohio?

**A.** Yes.

**Q.** And as it relates to the vehicle that was searched pursuant to Government's Exhibit 7, the search warrant, do you recall what was located in the trunk of the vehicle?

**A.** Yes.

**Q.** And, sir, what was in the trunk of that vehicle?

**A.** There was some plastic bags, and then also a very large piece of the exhaust of the vehicle was inside of the trunk.

MR. SAUNDERS: I have no further questions of this witness at this time.

THE COURT: Mr. Fogt.

MR. FOGT: Thank you.

**CROSS-EXAMINATION**

BY MR. FOGT:

**Q.** Good afternoon, Detective.

**A.** Afternoon, sir.

**Q.** You have in front of you Government's Exhibit No. 4, correct, sir?
**A.** Yes.
**Q.** That was the email BOLO. I believe this was the first one that was sent out; is that correct?
**A.** Yes, this is the first one that I sent to the City of Dayton police officers.
**Q.** Nowhere in that BOLO does it describe the person in the photographs, correct?
**A.** Are you referring as like height, weight type of description?
**Q.** There is not a race -- there is not a race identifiable, correct? A written.
**A.** No. Whatever was written, it was --
**Q.** Give me one second if you don't mind. As you mention, there is no height and weight given, correct?
**A.** Correct.
**Q.** And there is no gender that's written, but there is photos, obviously, correct? Or attached?
**A.** Yes.
**Q.** Very good. Are you familiar with Government's Exhibit 1? Is that in front of you?
**A.** No, it's not in front of me.
MR. FOGT: Thank you, Deputy Clerk.
BY MR. FOGT:

**Q.** After looking at that, did you create that BOLO?
**A.** No.
**Q.** Have you seen it before today?
**A.** Yes, sir.
**Q.** And just like the last BOLO that we went over, there is no physical description of the suspect, correct?
**A.** Correct.
**Q.** You testified on direct that the Flock system was utilized in this matter, correct?
**A.** Yes.
**Q.** A Flock system is in relation to the vehicle, the Ford Taurus, correct?
**A.** Yes.
**Q.** And kind of going on with the search of the car, what dates, if any dates, was the car located near the locations of the robberies?
**A.** I'm sorry. Could you ask that question again?
**Q.** I can paraphrase it or ask it a different way. Was the Flock system capture the Ford Taurus on the date of December the 3rd at or around Sunoco on Wayne Avenue in Dayton?
**A.** I don't believe the 3rd was one of the days where it was captured on the system. I do have a catalog list that lists all of them. I would note that there is numerous locations in Southwest Ohio where this happened.
**Q.** Let 's do this for now. We'll see how good your memory

is, and if needed, we'll refresh it as needed.
The 4th, Marathon, 4412 Linden Avenue, was the Flock system utilized?
If you don't know, just say you don't know. I'm not being mean. I'm just --
**A.** We utilize the Flock system to try to locate the vehicle on every known robbery that we try -- that we associated with this suspect. If you are asking me if I can recall one specifically for the December the 4th robbery --
**Q.** Um-hmm.
**A.** -- that was relatively close to that location, I don't recall that we found one fairly close to that location.
**Q.** Okay. Let's do the same exercise on the 6th. Ray's, 720 Xenia Avenue, Dayton.
**A.** Yes, extremely close to that location and extremely close to the time that the crime occurred.
**Q.** The 7th, Free Pike Drive.
**A.** Yes. Within a few miles of that location, on the date and relatively close time to the occurrence of the robbery.
**Q.** The 8th, Sunoco, 1053 Selma Road, Springfield.
**A.** Yes, I recall that there was Flock pictures associated with that robbery in Springfield. I'm not intimately aware of the times as that was one that was in Clark County.
**Q.** The 10th of December, Mini Mart, 1117 North Main Street?
**A.** None that were extremely close. That area of Main

Street is somewhat devoid of Flock cameras presently.
**Q.** And I assume back then?
**A.** Yes.
**Q.** December the 11th, 2024, Marathon, 1737 East Fifth.
**A.** Yes, located on Flock, extremely close to the location of the robbery and extremely close, within minutes, of when the robbery occurred.
**Q.** And December the 15th, 2024, Sammy's Drive-Thru, 920 Woodman Drive, Dayton?
**A.** Yes. It was located on Flock prior to the robbery, just inside the City of Dayton limits, on the date, I believe, prior to the robbery, maybe within -- I don't want to give you an incorrect time. It would be noted on there, but it was located, I believe, prior, just prior to the robbery of Sammy's on Woodman.
**Q.** Is it within your knowledge about how many or -- yeah, how many Flock cameras are in the Dayton area?
**A.** No, sir, it's not. There are quite a few.
**Q.** And you participated in the search of the vehicle yourself?
**A.** Yes.
**Q.** Was that after gaining -- after approval of the search warrant?
**A.** Yes.
**Q.** You did not author the affidavit of the search warrant,

Christopher Reed did; is that correct?
**A.** Yes, sir.
**Q.** And he was present when executing the search warrant?
**A.** Yes, he was.
**Q.** Anybody else other than you and Chris, Special Agent? Anybody else present?
**A.** I recall one or two of our evidence crew officers were present. Because it's quite a large garage and it's part of their work area, I don't recall which one or two they were. They were male officers, though. I do recall that.
**Q.** I understand. Did they assist you in this, or were they just present? Meaning were they working on this matter with you, or were they working on a different matter in the garage?
**A.** They were working on their own assigned matters in the garage.
**Q.** Looking at Government's Exhibit 5, this preinterview form, you got Timothy Farr's background, social security, date of birth redacted, address, the location of where he was going to be interviewed, or interviewed, date, time, and his phone number; is that accurate?
**A.** Yes.
**Q.** Very good. Looking at the body of it, under the centered "Your Rights," there is no marks made on that part of the piece of paper, correct?
**A.** Centered, and right, other than where it says "Signed,"

and that's where Special Agent Reed wrote "Lawyer."

**Q.** Very good. Is that because Mr. Farr asked for one?

**A.** Yes, sir.

**Q.** Very good. And the interview was terminated right away?

**A.** Yes. He wasn't questioned about the incidents.

**Q.** Very good. Nothing further, Detective.

MR. FOGT: Thank you, Your Honor.

THE COURT: Any redirect?

MR. SAUNDERS: No redirect, Your Honor. Thank you.

THE COURT: May this witness be excused?

MR. SAUNDERS: Yes, sir. Thank you.

THE COURT: You may step down.

THE WITNESS: Yes, Your Honor.

THE COURT: Anything else, Mr. Saunders?

MR. SAUNDERS: I apologize I was 30 minutes late, sir. Nothing further.

THE COURT: Do you wish -- at this point in time, do you wish to move the admission into evidence of your exhibits?

MR. SAUNDERS: Yes, Your Honor. The United States would move to admit Government's Exhibit 1 through 7. For purposes of the record, Government's Exhibit 2, 3, and 6 are the entirety of the multimedia, but the clips were 3a, 3b, 3c, just for the record. But we would move to admit the entirety for -- of the exhibits.

THE COURT: Just so I've got it clear -- and then

I'll let Mr. Fogt add anything he wants to add -- the other exhibits have been identified -- marked, identified, and testified to. There was no reference to Exhibit 6 or Exhibit 6a. What you are telling me is that the clips that were played in the early exhibits of 2, 3, and 4, is it?

MR. SAUNDERS: 2, 3, and 6 are the entirety.

THE COURT: That's the entirety. So basically what you are saying is you are moving that we admit the entire media with regard to this incident?

MR. SAUNDERS: If Mr. Fogt wants that. The government's fine with what was played into the record, but if Mr. Fogt wants the entirety for review, I would have no objection.

THE COURT: Mr. Fogt, over to you. Well, first, do you have any objection -- well, let me ask the question first. What's your, I guess, preference with regard to the media?

MR. FOGT: The clips that were played, Your Honor.

THE COURT: Just the clips that were played?

MR. FOGT: Yes, sir.

THE COURT: So if we're just going to play the clips -- we're just going to admit -- well, I am going to rule on the clips that were played, then the government's no longer requesting admission of 6 or 6a?

MR. SAUNDERS: We would request admission of 6a but not 6, and then we'd request admission of 3a, 3b, and 3c but

not 3, but then 2a but not 2.

THE COURT: What is 6a?

MR. SAUNDERS: 6a is the clip of the interview. The entire interview was like eight minutes long, but we only played the clip from the interview.

THE COURT: So 6a is represented to the Court as being basically a clip which is what the waiver form depicts, I guess?

MR. FOGT: That's my understanding, Your Honor.

THE COURT: So do you have any objection to 6a?

MR. FOGT: I don't have any objection to it, Your Honor. I think the testimony in Exhibit 5 that's been discussed fulfills 6, but no objection about 6a. Thank you, Your Honor.

THE COURT: All right. So the Court will, without objection, will admit Government's Exhibit 1, 2, 2a, 3, 3a, 3b, 3c, 4, 5, 6a, and 7. Is that right?

MR. FOGT: It's defense's understanding, Your Honor, no objection to what's been stated by this Court. Thank you, Your Honor.

MR. SAUNDERS: No objection.

THE COURT: All right. They will be admitted.

(Government's Exhibits 1, 2, 2a, 3, 3a, 3b, 3c, 4, 5, 6a, and 7 were received in evidence.)

THE COURT: Mr. Fogt, anything? Any evidence?

MR. FOGT: No witnesses, no evidence to present. Thank you.

THE COURT: Counsel, here's what we'll do: Is there a request for a transcript?

MR. SAUNDERS: Yes, sir.

THE COURT: Mr. Fogt?

MR. FOGT: Yes, sir. Thank you.

THE COURT: The transcript will be available July the 15th. Memo in support, Mr. Fogt, of your motion is due August the 4th. Mr. Saunders, the government's response will be due August the 25th. Mr. Fogt, if you have a reply, it will be due September 4th.

At this time, the Court will set the matter for final pretrial on Monday, October the 6th, at 10:30. The matter will be set for trial on October the 21st, of course, to commence at 9:00.

Any questions, Mr. Fogt?

MR. FOGT: No questions, Your Honor. If I'm getting ahead of myself, I apologize. I have a trial set in front of Judge Newman on the 20th of October. It is a long ways off. I don't think it will go, but I just want to let the Court know that. Thank you.

THE COURT: I am assuming that -- counsel approach.

(Sidebar off the record.)

THE COURT: Again, final pretrial, Monday, October

the 6th, at 10:30, and trial will be October the 21st at 9:00.

Anything further, Mr. Saunders?

MR. SAUNDERS: No, sir. Thank you.

THE COURT: Mr. Fogt?

MR. FOGT: No, sir.

THE COURT: Thank you very much.

THE COURTROOM DEPUTY: All rise. This court stands in recess.

(Proceedings concluded at 3:08 p.m.)

CERTIFICATE OF REPORTER

I, Mary A. Schweinhagen, Federal Official Realtime Court Reporter, in and for the United States District Court for the Southern District of Ohio, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

s/Mary A. Schweinhagen

__________________________________ 11th of July, 2025

MARY A. SCHWEINHAGEN, RDR, CRR
FEDERAL OFFICIAL COURT REPORTER